

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 10, 2021

**VIA ECF & E-MAIL**
The Honorable Mary Kay Vyskocil
United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

      Re:    United States v. Jorge Navarro, S6 20 Cr. 160 (MKV)

Dear Judge Vyskocil:

      Jorge Navarro's case reflects failings, greed, and corruption at virtually every level of the world of professional horse racing. For money and fame, corrupt trainers went to increasing extremes to dope horses under their care. Unscrupulous owners, who stood to profit directly, encouraged and pressured trainers to win at any cost. Veterinarians sworn to the care and protection of their patients routinely violated their oaths in service of corrupt trainers and to line their own pockets. Assistants and grooms all witnessed animal abuse in the service of greed, but did little to stop such conduct, and engaged in myriad ways to support notoriously corrupt trainers. Structures designed for the protection of the horses abused in this case failed repeatedly; fixtures of the industry – owners, veterinarians, and trainers – flouted rules and disregarded their animals' health while hypocritically incanting a love for the horses under their control and ostensible protection. Standing as the keystone for this structure of abuse, corruption, and duplicity was Jorge Navarro, a trainer who treated his animals as expendable commodities in the service of his "sport."

      Navarro's stipulated Guidelines sentence, and the appropriate sentence in this case, is sixty months' imprisonment.[1]

---

[1] Pursuant to the parties' plea agreement, Navarro has agreed to forfeit a total of $70,000, which represents the value of the adulterated and misbranded drugs the defendant illicitly obtained and administered to racehorses. Navarro has further agreed to pay restitution in the amount of $25,860,514, reflecting the amount of ill-gotten purse winnings Navarro-trained racehorses won during the course of the conspiracy. The defendant's restitution obligation is joint and several with any amount of restitution ordered by the Court to be paid by any other defendant owing funds to victims of the offense conduct charged in Count One of the S6 Indictment. A proposed restitution order and sealed schedule of victims (here, those entities from whom purse winnings were obtained through the immediate effect of Navarro's fraud) is submitted herewith under seal. The court has previously approved the parties' consent preliminary order of forfeiture, and the

I. **Offense Conduct**

Jorge Navarro ("Navarro" or the "defendant") earned tens of millions of dollars in purse winnings by training and racing thoroughbred horses that Navarro had "doped" using a plethora of adulterated and misbranded performance-enhancing drugs ("PEDs"), including (among others) blood builders, vasodilators, SGF-1000, baking soda "drenches," "bleeder" pills, and other drugs not approved by the Food and Drug Administration ("FDA"). Navarro's aggressive pursuit of PEDs – and his eagerness to use racehorses under his care to test the potency of novel PEDs – displayed a particularly callous disregard for the well-being of the horses under his care and control.

A. **Navarro's Doping Program**

Navarro's doping conspiracy was multi-faceted and sprawling. Navarro obtained PEDs from, among others, Medivet, Nicholas Surick, Gregory Skelton, Christopher Oakes, Seth Fishman, Erica Garcia, Michael Tannuzzo, and Marcos Zulueta. Those drugs ranged from pain relievers, red acid, "bleeder" pills, ventipulmin, SGF-1000, and various blood builders. Navarro's means of evading detection of this unlawful scheme included: the use of drugs that Navarro believed would be untestable by racing officials; the coordination of the administration of those drugs with other trainers and veterinarians to avoid physical detection by racetrack employees and racing authorities; and the preparation, in coordination with certain corrupt veterinarians, of false veterinary bills designed to deceive racing officials and/or racetrack employees who might demand proof of a valid course of veterinary care.

There was no question that, throughout the charged conspiracy, Navarro understood what he was doing was wrong. Navarro often warned, and was warned by, trainers to ensure that no one would be caught "doping" their horses. For example, on a January 11, 2019 call between Navarro and another individual, in which Navarro learned that a particular drug was being injected to his racehorse's neck, Navarro cautioned: "Please I need your help but I want you guys to be careful. The day they feel they are watching you, you give it in the mouth, okay?" Exhibit A[2] at 2. Administering drugs orally (rather than through the horse's skin where a puncture wound might be visible) was one method by which Navarro surreptitiously administered drugs, including the manner in which he administered drugs to "XY Jet" in advance of the Golden Shaheen Race in the United Arab Emirates, as discussed below.

On February 18, 2019, on a call with fellow trainer Michael Tannuzzo, Navarro discussed using "red acid," a "block" and drenches prepared by Christopher Oakes. *Id.* at 64-65. Although Navarro had previously discussed with Oakes various ways in which Oakes could assist Navarro

---

Government requests only that the Court's oral pronouncement of sentence include the amount of the forfeiture money judgment previously agreed.

[2] The Government respectfully requests that Exhibits A, B, and D be filed under seal pursuant to the Protective Order, and given that they contain non-public personal identifying information.

in doping horses (including "XY Jet"), Navarro nonetheless told Tannuzzo: "I gotta be careful the way I tell him things, okay?," to which Tannuzzo responded, "Yeah, you have to be very careful. . . . Very careful." *Id.* at 65. Navarro later on the call explained, "as much as we've got boys, fuck that, everybody talks, Mikey . . . we gotta close the circle." *Id*. Prior to that call, Jason Servis had warned Navarro that Navarro's barn area may be subject to search by a racetrack official. Navarro related this to Tannuzzo on another February 18 call: "Jason Servis called me, Jason Servis called me yesterday to let me know. I guess Jason Servis got someone in security that called him up and told him. . . . Yea fuckin' if [the racetrack official] showed up, if he showed up at 5, he would of caught our asses fuckin' pumpin' and pumping and fuming every fucking horse runs today." *Id.* at 63. Less than a month later, on a March 10, 2019 call with Marcos Zulueta, Navarro lamented to Zulueta: "Marcos, we need to clean up things because they are going to fuck us up. They are going to kick us out of the business if we keep up with the craziness; they are going to kick us out of the business, Marcos." *Id.* at 98. Of course, despite acknowledging the illicit nature of his doping program, and the repercussions if he were to be caught, Navarro continued to dope horses until his arrest in March 2020.

Navarro further knew that he was illicitly and improperly doping his horses on the basis of the appearance of the bottles of PEDs Navarro administered. Navarro's phones included text messages, chats, and photographs of drugs that were: (1) labeled with the warning: "Federal law restricts this product to use by or on the order of a licensed veterinarian," (2) contained a handwritten label in Sharpie directly on the bottle; or (3) had no label at all, as depicted below:





Navarro not only sought out novel, purportedly untestable drugs, *see* Exhibit A at 58-59 (discussing an "untestable" drench designed by Oakes that could be administered race day), or drugs administered in a manner such as to make them untestable, he also sought to falsify records that would otherwise link him with purchases of PEDs. In particular, Navarro's purchases of PEDs from Gregory Skelton were invoiced using false line items, so as to conceal Navarro's purchases of PEDs from any regulatory agencies or tracks that might review his paperwork. This was typical of Navarro's practice. On a January 22, 2019 call in which Navarro discussed with Zulueta a "liver cleanse" medication that Navarro had purchased abroad and was shipping into the United States, Navarro reassured Zulueta that the shipment "is not under my name—it's not under my name. It's under somebody else." *Id.* at 12. When Zulueta later warned Navarro repeatedly, "Do not use your name," Navarro responded, "No, no! Are you crazy! No! I don't use my name for anything." *Id.* at 24.

Throughout Navarro's years-long conspiracy, Navarro was the critical component in a network of fraud – the individual who amplified the corruption of horse owners and encouraged the corruption of his underlings. For example, on May 29, 2019, Navarro held a conference call with the owner and operator of a racing stable in California, for whom Navarro was a trainer, during which they discussed a series of poor performances by "Nanoosh," a racehorse trained by Navarro. During the call, one of the individuals questioned whether Navarro was "giving them ["Nanoosh"] all the shit," later asking, "Is this horse jacked out? Is he on fucking pills or what or are we just fucking –," to which Navarro responded, "Everything...he gets everything." The owner then cut the discussion short, stating: "You don't have to tell me on the phone." *See* S6 Indictment, ¶ 29(h).

As for veterinarians, Navarro used Skelton, Seth Fishman, and Erica Garcia, not for their veterinary skills, but as drug dealers willing to ignore their own oaths to tend to the health and welfare of animals in the service of providing Navarro with various PEDs, including blood builders and illegal growth factors. Navarro's corrupt relationship with Garcia was emblematic of the way in which he used veterinarians, *not* for their professional skills, but for the cover that they provided in order to skillfully and surreptitiously inject illegal drugs without arousing suspicion. Navarro pushed Garcia to facilitate his doping program, and she readily agreed. For example, Navarro and Garcia engaged in the following conversations about the doping of various horses using the misbranded blood builder known as "monkey," the contents of which Garcia had no way of knowing despite her repeated injections of that substance at Navarro's direction. For example, on January 14, 2019, the two discussed and confirmed administering "monkey" to Navarro-trained racehorses:

| | |
|---|---|
| **NAVARRO:** | Okay, alright at Palm Meadows, I'm gonna leave you a bottle of a - |
| **GARCIA:** | Monkey? |
| **NAVARRO:** | The monkey? "Tweeting"[3] got it already. |
| **GARCIA:** | Who got it? |
| **NAVARRO:** | "Tweeting." You gave it to her already—you gave it to her already yesterday. |
| **GARCIA:** | Ummm…yes, that's right. |
| **NAVARRO:** | Alright, so you're gonna go and you're gonna hit "True Bold." |
| **GARCIA:** | So just the Calders needs "monkey"? |
| **NAVARRO:** | You're gonna hit "True Bold,"[4] "Chunnel,"[5] "Council Return,"[6] and "Alia Story."[7] |

---

[3] "Tweeting" was a Navarro-trained horse that raced January 16, 2019 in Gulfstream Park and placed second, winning a purse of $52,000.

[4] This appears to have been a reference to "True Boots," a Navarro-trained horse that raced January 16, 2019 in Gulfstream Park and placed third, winning a purse of $31,000.

[5] "Chunnel" was a Navarro-trained horse that raced January 16, 2019 in Gulfstream Park and placed fifth, winning a purse of $51,000.

[6] This may be a reference to "Salsa's Return," a NAVARRO-trained horse that raced January 16, 2019 and placed second, winning a purse of $23,500.

[7] This is a reference to "Alliya's Story," a NAVARRO-trained horse that raced January 16, 2019 in Tampa Bay Downs and placed sixth, winning a purse of $22,500.

| | |
|---|---|
| **GARCIA:** | Okay. |
| **NAVARRO:** | Alright, those 4. |
| **GARCIA:** | Okay. |

Later, on January 14, 2019, Navarro and Garcia engaged in the following conversation:

| | |
|---|---|
| **NAVARRO:** | So when are you going to Calder? |
| **GARCIA:** | Right now. |
| **NAVARRO:** | Oh man. Give me a couple—give me a couple minutes please? So I can drop off the "monkey." |
| **GARCIA:** | Well, that's what I was thinking cuz I gotta do two shots for Calder—let me knock Calder out, just come to Calder okay? |
| **NAVARRO:** | Alright, alright, I'll drop it off. |

Exhibit A at 4, 6-7.

Those were merely two calls amidst scores of communications between Garcia and Navarro in which the two discussed administering PEDs, including "monkey," to horses at Navarro's direction, with no purpose other than to serve Navarro's avarice. In another such conversation, on February 13, 2019, Navarro raised Shancelot[8] with Garcia and asked if she would "grease the monkey?" Garcia responded, "Got it." Navarro then confirmed whether Garcia "ha[d] enough monkey," prompting Garcia to check: "Uhhh I think I have, I don't know if I have two shots. It will be damn close. Let me see. Yea yea I do. I got 20." *Id.* at 62-63.

### B. The Doping of XY Jet

Notwithstanding his hypocritical and self-serving claim to have "loved" the horse, Navarro's course of conduct with "XY" Jet merely exemplifies his aggressive pursuit of new drugs with which to dope his horses. Navarro's frantic efforts to dope "XY Jet" in advance of a February 13, 2019 precursor race to the $2.5 million Golden Shaheen race were emblematic of his approach to racing, and indicative of the nature of Navarro's discussions when speaking with complicit third parties, in contrast to how Navarro apparently comported himself around others. *See generally* Def. Sent. Subm. Ltrs.

"XY Jet," a seven-year-old racehorse at the time of the Allowance Optional Claiming race at Gulfstream Park on February 13, 2019, had undergone knee surgery three separate times prior to that race.[9] A few days prior, on February 9, 2019, Navarro implored Zulueta for help: "I have a problem and you need to get me out of it," then asked for a bottle of "blocker" (a pain medication) to use on "XY Jet" because "XY Jet is racing" and the "twenty bottles" of blocker that Navarro

---

[8] Shancelot wass a Navarro-trained horse that raced February 16, 2019 in Gulfstream Park and placed first, winning a purse of $50,000.

[9] *See* Michaele MacDonald, *Three Times Under the Surgeon's Knife – but XY Jet may be better than ever now*, Thoroughbred Daily News, March 28, 2018, https://www.thoroughbredracing.com/articles/three-times-under-surgeons-knife-xy-jet-may-be-better-ever-now/.

had ordered had not yet arrived. Exhibit A at 28-29. Navarro then secured Zulueta's promise to send a bottle of blocker "overnight" to ensure that Navarro received it before the race. *Id.* Navarro, despite Zulueta's assurances, called Oakes the next day to discuss doping "XY Jet, stating that "XY Jet" "never tied up in his fucking life and he ties up today," and the two discussed administering a baking soda "drench" to "XY Jet" immediately, and "the day of the race" to ensure that "XY Jet" could still perform notwithstanding the physical toll that Navarro's program had already placed on the horse. *Id.* at 30-31. On a call later that same day between Oakes and Navarro, Navarro related his conversation with "Doc" in which Navarro discussed various drugs, including the "Orange," the "shaker," a pink "pain medication you give four hours before lasiks," a drug "better than red acid," and a "tie-up shot." *Id.* at 32-35.

Two days before the race, on February 11, 2019, Navarro and Zulueta discussed the fact that "XY Jet" had tied up, and Zulueta discouraged Navarro from racing the horse, stating, "Do not race him—do not race him, then." *Id.* at 38. Navarro brushed those concerns aside, stating, "I started treating him right away. When he peed . . . he didn't pee too much blood or anything ugly." *Id.* Navarro then detailed what he had given, and planned to give, to "XY Jet" to ensure he could race, stating that he had given that horse a serum, "baking soda," and planned to inject the horse with the "blocker" they had discussed earlier. *Id.* Navarro told Zulueta, "you should keep quiet, do not say shit about it [the "blocker"], man," and Zulueta responded later on the call, "let me warn you, let me warn you, . . . when you get a hold of that blocker . . . don't show it to anyone." *Id.* at 40, 44. Later that day, Navarro and Oakes arranged to meet in person, after Oakes had confirmed that he "got that thing," *i.e.*, the bottle of "blocker." *Id.* at 45-46. Navarro, intent on ensuring that he received the drugs he believed were necessary to compel "XY Jet" to race, called Gregory Skelton and made plain why he was going to such lengths to prop up "XY Jet," stating: "I got the nice horse XY Jet that he has gone through three knee surgeries . . . *I wanted to do him with that today* so Chris got it for me. . . . I am thinking of going to Dubai with the horse. . . . Chris was telling me with that product that you have for tie ups." *Id.* at 46-47 (emphasis added).

The next day, on February 12, 2019, the day before the race, Navarro reached out to yet another individual and solicited items that could be used to drench "XY Jet": "I need the tube, the pump and the bucket." *Id.* at 49. When Navarro was asked if someone else would be "tubing" the horse, Navarro responded: "Yes. No, you cannot—cannot tube him because you will go to jail, man. My friend is going to tube him. My friend is going to prepare a milk shake for him," later adding, "This is between you and I." *Id.* at 49-50. On a separate call with a representative of one of "XY Jet's" owners, Navarro confirmed that he planned to milkshake the horse, and when asked whether the horse would then test positive, Navarro responded, "Don't worry about it. I use something that covers the baking soda, the bicarb." *Id.* at 52.

The morning of February 13, 2019—the day of XY Jet's race, when Navarro expected to drench the horse—Navarro expressed to Zulueta his desire "to know how to tube, buddy. I would tube all my horse[s]." *Id.* at 58. Zulueta attempted to dissuade Navarro from "tubing," stating, "you have to be fucking—fucking careful. I tried—I tried to do that and I almost killed the horse—the horse, man. It went to the lungs," to which Navarro responded, simply, "Yes." *Id.* at 59. Far from expressing trepidation at the notion of drenching "XY Jet" following Zulueta's warnings of what could go wrong if done incorrectly, Navarro later spoke with Oakes to ensure that Oakes was meeting Navarro at the barn: "Drive right through if anything. If they stop you, you are an owner

Case 1:20-cr-00160-MKV   Document 592   Filed 12/10/21   Page 8 of 19

Page 8

and you come to Navarro's barn." *Id.* at 115. "XY Jet" raced later that day, placing first in an "easy victory," and winning a purse of $31,900. *See* Exhibit C.

On March 30, 2019, "XY Jet" placed first at the Golden Shaheen, despite losing a shoe in the middle of the race. In discussing that race after the fact with Zulueta, Navarro related the number of different drugs he had administered to that horse, including a drug "that doesn't come out positive," and when asked whether Navarro "tubed" "XY Jet" the day of the race, Navarro responded, "No, no my man. I gave it to him—I gave it to him through 50 injections, I gave it to him through the mouth. Are you crazy? Everything through the mouth, everything through the mouth." *Id.* at 118.

## II.   Procedural History

On February 26, 2020, a federal grand jury sitting in the Southern District of New York returned an Indictment charging 19 individuals, including the defendant, with engaging in various conspiracies to manufacture, distribute, administer, and/or receive adulterated and misbranded PEDs intended for use on racehorses, and to secretly administer those PEDs to racehorses under scheme participants' control, with the intent to mislead and defraud various people and entities, including federal and state drug and horse racing regulators. *United States v. Navarro et al.*, 20 Cr. 160 (MKV) (S.D.N.Y.). Navarro was charged in two counts of participating in two separate conspiracies: one in service of his scheme of obtaining PEDs in order to dope and racehorses, and the second in service of Servis' scheme of obtaining PEDs in order to dope and racehorses under his control. On November 5, 2020, the grand jury returned the superseding and operative S6 Indictment, containing those same two counts.

On August 11, 2021, Navarro pleaded guilty, pursuant to a plea agreement, to Count One of the S6 Superseding Indictment, charging Navarro with one count of conspiracy to manufacture, distribute, receive, and administer adulterated and misbranded drugs with the intent to defraud or mislead, in violation of Title 21, United States Code, Sections 331 and 333. Navarro was among the first defendants in *United States v. Navarro* to enter a change of plea publicly, did so prior to filing or joining in any dispositive motions, and did so prior to learning of the Court's recent decision denying the remaining defendants' suppression motions. Under the terms of the parties' agreement, Navarro specifically admitted to the following facts:

1. From at least in or about 2016 through on or about March 9, 2020, Navarro administered and directed others, including veterinarians working at his direction, to administer non-FDA approved, misbranded and adulterated drugs, including drugs intended to increase the performance of thoroughbred racehorses under his custody and care.

    a. Those drugs included "blood building" substances produced by, among others, Gregory Skelton and Seth Fishman; vasodilators; an imported, misbranded bronchodilator; "bleeder" pills developed by Seth Fishman; SGF-1000; and others.

    b. Each of those drugs was misbranded and/or adulterated insofar as they were new animal drugs without FDA approval, were administered to Navarro's horses with

    no valid prescription, and/or were manufactured in facilities without FDA registration.

2. Among the horses to which Navarro administered such drugs were the horses XY Jet, War Story, Shancelot, Sharp Azteca, and Nanoosh.
    a. Among other incidents, Navarro administered these drugs to XY Jet, including "blood building" substances, from in or about February 2019 through March 2019, in order to enhance XY Jet's performance at the Allowance Optional Claiming race at Gulfstream Park, on February 13, 2019, and at the Dubai Golden Shaheen race in the United Arab Emirates on March 30, 2019.

    b. In or about May 2019, Navarro and one of the owners of Nanoosh agreed to continue administering such drugs to that horse in order to improve Nanoosh's racing performance.

3. Navarro also participated in the interstate shipment and distribution of non-FDA approved, misbranded and adulterated drugs, including by shipping a "blood building" substance to New Jersey, where that drug was received by co-defendant Michael Tannuzzo, in or about May 2019.

4. During the course of the scheme, Navarro also provided an imported, misbranded bronchodilator drug to, among others, co-defendant Jason Servis.

5. Among Navarro's means of evading detection of this unlawful scheme were: the use of drugs that Navarro believed would be untestable by racing officials; the coordination of the administration of those drugs with other trainers and veterinarians to avoid physical detection by racetrack employees and racing authorities; and the preparation, in coordination with certain complicit veterinarians, of false veterinary bills designed to deceive racing officials and/or racetrack employees who might demand proof of a valid course of veterinary care.

Navarro further stipulated that, among other aggravating factors, the applicable intended loss amount at issue in this case was greater than $25,000,000.

    **C. The Presentence Report and Navarro's Breach of His Plea Agreement**

    The PSR calculates the defendant's offense level as 35, and his criminal history category as I, consistent with the calculations set forth in the plea agreement. PSR ¶¶ 109, 114-15. However, because the maximum statutorily authorized sentence is less than the minimum of the applicable Guidelines range, the defendant's Guidelines sentence is 60 months' imprisonment.

    In his sentencing submission, Navarro blatantly breaches the plain terms of the parties' plea agreement. Despite *agreeing* to the calculation set forth above in the parties' plea agreement, and despite further agreeing that "neither party will seek any *departure or adjustment* pursuant to the Guidelines that is not set forth herein," Navarro asks the Court to depart and adjust the stipulated Guidelines sentence on the basis of out-of-circuit precedent never adopted in this

Circuit, and contrary to the Guidelines calculations in the plea agreement and the PSR. Def. Sent. Subm. at 4 (ECF No. 582).[10] Navarro's decision to breach the terms of his plea agreement provides the Government with the choice between two options: insisting on specific performance (*i.e.*, holding Navarro to his original agreement that the stipulated Guidelines calculation was and remains the applicable calculation) or recission of the agreement and proceeding to trial. *See United States v. Cimino*, 381 F.3d 124, 128 (2d Cir. 2004) ("Accordingly, we hold that, when a defendant breaches his plea agreement, the Government has the option to either seek specific performance of the agreement or treat it as unenforceable."). The Government opts to hold Navarro and his counsel to their word, which also happens to reflect the actual facts of the case, the terms of the Guidelines, and prevailing Second Circuit law.

Apart from the Guidelines calculations, the PSR recommends several standard and special conditions of supervised release for the Court's consideration. The Government respectfully requests, pursuant to U.S.S.G. § 5F1.5(a), that the Court impose the additional special condition of supervised release, namely, that the defendant be prohibited from engaging in the occupation, business, or profession of training racehorses, including by requiring that the defendant relinquish any state-issued license required for engaging in that profession for the term of his supervised release, which cannot exceed three years. Given the nature of the offense of conviction, which involved "doping" horses by dint of the opportunity, access, and latitude afforded to licensed racehorse trainers, there is "a reasonably direct relationship" between the proposed restriction on the defendant's occupation and "the conduct relevant to the offense of conviction," as required under the Sentencing Manual. U.S.S.G. § 5F1.5(a)(1). Such a restriction is further "reasonably necessary to protect the public" given the breadth of the defendant's "doping" activity, and the likelihood of recidivism if the defendant is afforded the opportunity to resume training racehorses. U.S.S.G. § 5F1.5(a)(2). Imposition of such an occupational restriction is warranted where the Court "adequately explain[s] the grounds for its determination that" such a special condition is "necessary" under U.S.S.G. § 5F1.5(a). *See United States v. Piper*, 799 F. App'x 66, 68 (2d Cir. 2020).

---

[10] *Cf. Harris v. United States*, 380 F. Supp. 2d 278, 284 (S.D.N.Y. 2005) ("Harris's claim that his counsel was ineffective in failing to argue for a downward departure for acceptance of responsibility from the Stipulated Sentence of 288 months does not satisfy the *Strickland* standard [for a showing of ineffective assistance of counsel]. If counsel had argued under *Rodriguez* for a reduction in Harris's sentence, counsel, *who co-signed the plea agreement with Harris, clearly would have been in breach of the plea agreement's provision for a Stipulated Sentence of 288 months*. Such a breach of the plea agreement would have permitted the Government to opt to prosecute Harris under Count One of the original Indictment-distributing 50 grams and more of 'crack' cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846—which has a maximum sentence of life imprisonment and a Guidelines range of 360 months to life, far exceeding the 240-month maximum sentence for violating 21 U.S.C. § 841(b)(1)(C) and the additional 48-month maximum sentence for violating 21 U.S.C. § 843(b), as charged in the Superseding Information. In addition, at the trial the Government would have had the right to use Harris's admissions of guilt during his plea allocution on September 22, 2000. Harris's counsel's failure to take such a disastrous course obviously does not fall below 'an objective standard of reasonableness' under 'prevailing professional norms.'" (emphasis added) (internal citations omitted)).

### D. Defense Sentencing Submission

Aside from breaching the plea agreement, Navarro argues in his submission that he ought to receive a below-Guidelines sentence because he otherwise enjoys no benefit to having entered a timely guilty plea. *See* Def. Sent. Subm. at 3. The defendant does not account for the fact that—absent the plea agreement—he would have been convicted at trial of *two* conspiracy counts in violation of Title 18, United States Code, Section 371, which would have yielded a statutorily-authorized maximum sentence of ten years' imprisonment in the face of precisely the same Guidelines analysis. His plea agreement, moreover, provided Navarro with coverage for mail and wire fraud charges, carrying still greater statutory penalties. A below-Guidelines sentence is not warranted. The timing and structure of Navarro's change of plea has already inured to Navarro's benefit, by cabining the maximum term of imprisonment he could face in this matter to five years' imprisonment. *Cf.* Def. Sent. Subm. at 3-4. The defendant sidesteps this point entirely.

Navarro's sentencing submission is otherwise devoted to reiterating statements from the appended letters of support filed on his behalf, many of which extol his purported "compassion[] with his horses," and "the overall care and respect he gave his horses." *Id.* at 7. Those claims are, alternatively, deeply uninformed or profoundly insincere. Navarro's behavior and attitude with complicit third parties, co-defendants, and unindicted co-conspirators paint a starkly different picture of the defendant. It is abundantly clear from thousands of phone calls and text messages intercepted over Navarro's phone and retrieved from Navarro's electronic devices that when Navarro was speaking privately to individuals he believed would assist in, encourage, or conceal and protect his criminal conduct, he made plain his intent to win at any cost – without regard for the health or well-being of the horses he trained.

It is not the case, as Navarro's wife claimed in her letter-submission, that Navarro took "the horses that no one liked no one wanted and was able to turn them around" with "[a] little attention and TLC[.]" Def. Sent. Subm. Ltrs. at 1. Navarro took horses and "turn[ed] them around" by drugging them with multiple, illegal drugs, thereby compelling them to race well beyond their natural abilities. Similarly, "XY Jet's" veterinary surgeon submitted a letter of support purporting to have discussed only "XY Jet's" "treatment and condition," and not anything to do with "the use of any illegal or unethical treatment." *Id.* at 75-76. This letter merely reflects Navarro's duplicity in hiding his actual treatment of his horses from ostensibly legitimate medical professionals. That letter fails to acknowledge that Navarro in fact doped "XY Jet," and did so by deploying *other* veterinarians and laypeople in order to obtain illicit drugs for purposes of doping that horse, and apparently hid this behavior from the person actually providing that horse with medical care.

Troublingly, several of the letters of support submitted by the defendant are authored by individuals who participated in, or were otherwise aware of, Navarro's doping practices. As such, their statements to the Court regarding Navarro's alleged consideration for racehorses ring false.

[redacted]



[11]

Many other letters similarly champion Navarro's training acumen, without acknowledging that his prominence in the industry was due predominantly to cheating the system by doping horses, completely undermining any reliance on his trainer statistics, accolades, and professional achievements. *See, e.g.*, Def. Sent. Subm. Ltrs. at 1-2, 9, 14, 35, 36, 37, 44, 54-55, 67, 74, 75, 78, 87, 97. To the extent those letters were submitted by individuals *not* involved in Navarro's doping operation, the letters fall short in the face of overwhelming evidence of Navarro's doping program: Navarro was far from a caring horseman; his horses were commodities to be doped, raced, and discarded.

### E. Sentencing Factors

#### a. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set

---

[11] The preceding paragraphs are submitted with a request that they be maintained under seal insofar as they reflect unindicted coconspirators and/or individuals who may remain under investigation.

forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### b. Discussion

As the Court is aware, the Government has carefully considered its view of the relative culpability of the defendants who have pled guilty thus far, keeping in mind the culpability of those defendants who have yet to reach any disposition in this case, and has endeavored to reach dispositions with Guidelines calculations that accurately and appropriately reflect the defendants' individual offense conduct and personal characteristics, their culpability relative to one another, as well as the quality of their acceptance of responsibility relative to the timing of their decisions to plead guilty. The defendants who have pleaded guilty thus far in this matter and their stipulated Guidelines ranges are listed below. This summary is provided for the Court's reference, but it of course does not capture the totality of the relevant considerations for each defendant.

- Jordan Fishman (Guidelines Range of 12 to 18 months' imprisonment): Jordan Fishman, a drug manufacturer, assisted Seth Fishman in creating and manufacturing adulterated and misbranded performance-enhancing drugs in his Massachusetts-based laboratory, for further distribution by Seth Fishman and Seth Fishman's sales representative, Lisa Giannelli. Jordan Fishman personally produced the illegal drugs for later distribution, created new drugs entirely at Seth Fishman's direction, and was involved in the manufacture of a variety of drugs. Jordan Fishman was not involved in the labeling, marketing, or sale (to consumers) of the illicit drugs he created, nor did he solicit customers or otherwise engage with customers, and did not otherwise promote the drugs that he created and produced. Unlike Navarro, Jordan Fishman did not have any animals under his care and/or control, and did not capitalize on that position to conceal the administration of drugs to racehorses.

- Michael Kegley Jr. (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence is

correspondingly adjusted to 30 to 36 months' imprisonment): Kegley, the Director of Sales of Medivet, unlike Navarro, held no professional license, and did not have direct access to racehorses as part of his profession. Likewise, unlike Navarro, Kegley did not engage in efforts to generate fraudulent invoices in order to conceal his purchases of adulterated and misbranded PEDs. Although Kegley claimed in a consensually recorded call to be aware that veterinarians engaged in the practice of false billing, he did not personally engage in this practice, nor was he in a position to facilitate this practice. Further, while Navarro was involved in the distribution of scores of adulterated and misbranded drugs, Kegley's criminal activity was predominantly confined to the distribution of a discrete set of adulterated and misbranded drugs.

- Marcos Zulueta (Guidelines Range of 30 to 37 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines Range is correspondingly adjusted to 30 to 36 months' imprisonment): Zulueta, a racehorse trainer, assisted Navarro in obtaining and administering performance-enhancing drugs for the purpose of doping horses, and exchanged tips with Navarro regarding new illicit drugs to administer to horses, and methods of administration. Zulueta not only procured illicit drugs, he personally administered them to the racehorses under his care and control. Although Zulueta, like Navarro and other trainers, stood to personally profit from the improved performance of the racehorses he doped, Zulueta-trained racehorses (and, by extension, Zulueta) earned comparatively less in purse winnings than Navarro, and over the course of the conspiracy, Zulueta raced fewer racehorses than Navarro.

- Christopher Oakes (Guidelines Range of 46 to 57 months' imprisonment but, given the statutorily authorized maximum sentence, the Guidelines sentence is correspondingly adjusted to 36 months' imprisonment): Oakes, a racehorse trainer, procured adulterated and misbranded performance-enhancing drugs from Seth Fishman, re-distributed at least one of those drugs to Navarro, and produced his own drench that was purportedly untestable even when administered the day of a race, which Oakes administered to his own racehorses (those he owned and trained) and provided to Navarro. Oakes additionally assisted Navarro in surreptitiously administering drugs to one of Navarro's racehorses, "XY Jet," the day that horse was scheduled to race, by sneaking past racetrack security officials and concealing from those same officials the true purpose of his entry into the racetrack and barn area where "XY Jet" was housed. As with the other convicted racehorse trainers, including Navarro, Oakes was licensed—and was thus proficient in various racing rules prohibiting the use of PEDs—and personally administered drugs to the horses under his care and control.

- Kristian Rhein (Guidelines Range of 135 to 168 months' but, given the statutorily authorized maximum sentence, the Guidelines Sentence is correspondingly adjusted to 36 months' imprisonment): Rhein was a veterinarian and Medivet-affiliate who conspired with Kegley and others to market, distribute, sell, and administer SGF-1000, and further illicitly distributed unprescribed clenbuterol.

>   Rhein was a licensed veterinarian who predominantly treated racehorses; as such, Rhein – like the licensed trainers convicted in this matter – was well-acquainted with the various legal regimes governing the sale and distribution of an adulterated and misbranded drug. Rhein, like Navarro, generated false invoices for customers, using misleading billing codes for SGF-1000 and the illicit clenbuterol he provided to racehorse trainers.  Unlike Navarro, Rhein's offense conduct was limited to a handful of adulterated and misbranded PEDs, whereas Navarro obtained and administered a number of different, and novel, PEDs.

Turning to Navarro, the 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate general and specific deterrence.  A Guidelines sentence of 60 months' imprisonment is the appropriate sentence – one sufficient but not greater than necessary to serve the purposes of sentencing when balancing Navarro's relatively early acceptance of responsibility, his heightened culpability relative to other defendants, the position of trust he enjoyed as a licensed racehorse trainer with direct and unconstrained access to racehorses, and his years-long participation in this conspiracy, which involved a multitude of PEDs.

The Government acknowledges that Navarro was among the first of the indicted defendants in this matter to admit his guilt, and did so prior to the resolution of several dispositive motions. That factor weighs in his favor, but is accounted for in the structure of the plea agreement itself and does not, on balance, warrant a sentence of less than the stipulated Guidelines sentence of 60 months' imprisonment.

First, the nature and scope of Navarro's offense conduct merits a Guidelines sentence. Navarro participated in the conspiracy for years, and in the course of the conspiracy, pursued many different PEDs from multiple different suppliers—both veterinarians and laypeople—in efforts to gain a competitive advantage. Navarro's criminality was motivated by his cynical efforts to boost his own profile and profits. In intercepted calls, Navarro discussed with multiple other corrupt trainers, veterinarians, and owners tips regarding new drugs to use in doping horses, and new methods for doping horses which would illicitly enhance performance.  *See, e.g.*, Exhibit A at 58 (Navarro discussing his desire to learn how to "tube" horses so he could tube all his horses); Exhibit B at 7 (Navarro discussing a shipment of CBD that a third party planned to send Navarro for use on Navarro's horses); Exhibit A at 34 (Navarro discussing on a call his conversation with a veterinarian wherein he asked "what's new out there" and then discussing a new pink-colored PED); *id.* at 110-114 (Navarro discussing with another individual using an experimental topical cream on a horse that was anticipated to have the same effects as a baking soda drench); *see also* Order Denying Suppression Mots. at 3 (ECF No. 589) (referencing Surick's statement that Navarro used blood builder " 'like fucking water,' " and that Surick supplied Navarro with " 'trays of red acid.' " (internal citation omitted)).

Second, a Guidelines sentence is necessary to provide just punishment and reflect the nature and seriousness of the offense given Navarro's casual attitude regarding his years-long "doping" conspiracy. It is not the case that Navarro's crime was the result of a single lapse in judgment, confined in time and scope. To the contrary, Navarro engaged in repeated and persistent

efforts to cheat over the course of years, cycling through various sources of supply, and pursuing aggressively new means to illegally dope horses. Yet Navarro never acknowledged the seriousness of his crimes. Navarro's flippancy towards his dangerous and illegal conduct is exemplified by calls, text messages (including the gleeful "monkey" emojis quoted above), and other evidence demonstrating that the defendant considered his prolific doping a badge of honor. Navarro, notorious as the "Juice Man" due to his routine "doping," kept a pair of customized shoes in his barn with the words "#JUICE MAN" emblazoned across the front, as depicted below.



Further, in discussing another individual's potent PED, Navarro casually related that a particular pain medicine offered for sale to Navarro was so powerful, "the guy [offering Navarro the drug] says he has killed about four horses already. . . . He is saying the horses can't take it, and die." Exhibit A at 57-58. In another such call, on February 13, 2019, the day of "XY Jet's" race, Navarro expressed his desire "to know how to tube, buddy" so that Navarro could "tube all my horse[s]." *Id.* at 58. Zulueta then related to Navarro that he had "almost killed [a] horse" by tubing the horse's lungs by mistake, leading the horse to "start[] vomiting." *Id.* at 59. Navarro responded simply, "Yes." *Id.*

Navarro's communications with others whom he considered complicit in his crimes further underscores his blasé attitude. In a January 26, 2019 text message—the day two Navarro-trained horses raced at Gulfstream Park and Tampa Bay Downs—one of Navarro's associates sent Navarro via text an embedded GIF of a syringe's plunger pulling back and loading the syringe with dollar bills, as depicted below:



The intensity of Navarro's doping was matched by his apparent glee in this illicit conduct. On July 10, 2018, in the course of a string of messages exchanged with his coconspirator and confidante Zulueta, Navarro sent the following message to express his enthusiasm for doping his horses with "monkey" and pills:



In short, when speaking privately with co-conspirators, Navarro did not maintain the pretense of caring about his horses' health. Navarro's nonchalance is further reason for this Court to impose a Guidelines sentence in order to convey the seriousness of Navarro's criminality.

Third, as exemplified by Navarro's intent to dope "XY Jet," who was struggling, Navarro cared little about the risks of, either, administering unknown drugs to horses, or of repeatedly pushing horses to perform beyond their natural abilities by masking their pain or "pumping" the horses with performance-enhancing drugs. His attitude towards "XY Jet" is in stark contrast to many of the letters of support enclosed with the defendant's sentencing submission; when Navarro was speaking only to a fellow co-conspirator, he revealed his true nature, namely, his elevation of race performance over medical care. Such damage to the health of Navarro-trained racehorses is difficult to quantify or to pinpoint with accuracy, in part, because many of Navarro's so-called "veterinarians" were active participants in his corrupt practices,[12] and thus actively assisted his

---

[12] Although multiple veterinarians conspired with Navarro to obtain and/or administer adulterated and misbranded PEDs to Navarro's horses, Navarro's offense also involved deceiving certain, legitimate veterinarians. *See, e.g.*, Exhibit A at 8 (instructing Michael Tannuzzo to "pull blood" and dope a horse "as soon as the vet turns around").

doping, instead of intervening and halting his dangerous conduct. "XY Jet," who last raced on December 21, 2019 at Gulfstream Park, and who had been in Navarro's custody for the prior approximately five years, died of an apparent heart attack approximately two weeks after his last race, at eight years old.[13] A necropsy report could not determine a cause for the heart attack; notably, Navarro's communications in the first quarter of 2019 indicated that, even one year prior, "XY Jet"—who had undergone three knee surgeries—was struggling, but was then-medicated so that he could race competitively.

Anecdotally, at least one individual who adopted a Navarro-trained racehorse (who is now 5 years old) in 2020 reported that the horse (who had placed in the top three finishing positions in multiple races in 2019) was "disfigured and unable not only to race competitively, but to do very much at all," and "suffers recurrent and painful physical problems[.]" *See* Exhibit D. In the horse's last race on September 14, 2019, despite placing second, the horse "ended the race with a severe misalignment of the bones in . . . the area above the hoof and below the 'ankle,'" and "was so badly injured he had to be vanned off the course." *Id.* That horse's injuries continue through the present, and are suspected to "cause him increasing pain as he grows older." *Id.* In an intercepted call on January 20, 2019,

Navarro discussed with Zulueta the physical effects of a PED administered intravenously to a horse, asking whether, in Zulueta's experience, the horses "start sweating, get warm." Exhibit A at 11. Zulueta described his horses as "get[ting] soak[ing] wet in sweat," after receiving an injection in the vein, leading Navarro to confirm, "And are they racing good when you do that?" *Id.* at 12. Later, on that same call, Navarro bragged about having given steroids to his horses, and described himself as "a man who destroys," and who "is racing against the best horses in the United States there." *Id.* at 15. Zulueta joked in response, "you should be happy . . . that you are not winning all of [the races]; otherwise you will be arrested." *Id.*

These are among some of the factors that put the lie to Navarro's submission and his multiple letters of support quoted in and appended to Navarro's sentencing submission, in which third parties claim that Navarro made decisions for the health and well-being of his horses. *See* Def. Sent. Subm. at 7. That notion simply does not comport with the hundreds of conversations wherein Navarro sought PEDs to use on his horses, discussed administering novel PEDs on his horses, pushed horses in poor physical shape to compete, and displayed indifference at the physical ramifications of administering PEDs to horses.

Further, a Guidelines sentence is necessary to afford adequate general deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). Racehorse trainers, who are entrusted with the care and custody of racehorses, have unfettered access to these animals, and by extension are entrusted to ensure those horses' care and health. Like veterinarians, trainers are afforded a certain latitude under the assumption that they are acting in good faith as competitors and as custodians of racehorses. Navarro exploited that good faith. He, like many actors in the racehorse industry had grown indifferent to, and dismissive of, the notion of obtaining illegal drugs to dope racehorses for profit. Racehorse trainers, in particular, assume that even if caught doping, they will have the means and

---

[13] *See G1SW XY Jet Dies*, Thoroughbred Daily News, January 8, 2020, https://www.thoroughbreddailynews.com/g1sw-x-y-jet-dies/.

wherewithal to obfuscate, litigate, and intimidate others into overlooking or justifying a violation, and thus continue their doping practices unencumbered. A Guidelines sentence of 60 months' imprisonment will send a strong signal to racehorse trainers and others in the industry that there will be serious consequences if they abuse their position of trust by engaging in the callous and dangerous practice of doping racehorses for profit. A significant sentence will counter the pervasive view in the racehorse industry that selling and administering adulterated and misbranded drugs is inconsequential and that the consequences of criminal activity will never amount to significant criminal penalties.

## Conclusion

The Government respectfully submits that the stipulated Guidelines sentence of sixty months' imprisonment is sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Andrew C. Adams

_____
Sarah Mortazavi
Assistant United States Attorneys

cc: Jason Kreiss, Esq. (via ECF)