LCHGnavS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              20 Cr. 160 (MKV)

5    JORGE NAVARRO,

6                                              Sentence
               Defendant.
7    ------------------------------x

8
                                              New York, N.Y.
9                                             December 17, 2021
                                              10:00 a.m.
10

11   Before:

12                   HON. MARY KAY VYSKOCIL,

13                                            District Judge

14                        APPEARANCES

15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   SARAH MORTAZAVI
     ANDREW ADAMS
18        Assistant United States Attorney

19   JASON W. KREISS
          Attorney for Defendant
20

21

22

23

24

25

LCHGnavS

1          (In open court)

2          THE COURT:  Good morning, please be seated everyone.

3          THE DEPUTY CLERK:  Counsel, starting with the

4     government, please state your name for the record.

5          MS. MORTAZAVI:  Good morning, your Honor.  Sarah

6     Mortazavi present for the government.  And with me at counsel

7     table is Andrew Adams, and from the FBI, Special Agent Timothy

8     Bergen.

9          THE COURT:  Good morning, Ms. Mortazavi, Mr. Adams and

10    Mr. Bergen.

11         MR. KREISS:  Good morning, your Honor.  Jason Kreiss

12    on behalf of Jorge Navarro, who is seated to my left.

13         THE COURT:  Good morning, Mr. Kreiss and Mr. Navarro.

14         THE DEFENDANT:  Good morning.

15         THE COURT:  Good morning too to our court reporter.

16    Thank you for being here.

17         So good morning everyone, as you know, I'm Judge

18    Vyskocil, we're here this morning for the purpose of sentencing

19    Mr. Navarro.  Before we proceed, Mr. Navarro, I just want to

20    confirm -- I believe you told me at the time of your plea --

21    you do speak and understand English clearly?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  You do not need an interpreter?

24         THE DEFENDANT:  No, your Honor.

25         THE COURT:  Ms. Mortazavi, are you taking the lead

LCHGnavS

1    this morning?

2                    MS. MORTAZAVI:  Yes, your Honor, I am.

3                    THE COURT:  Have any victims who are entitled to

4    notice been provided with notice of today's proceeding?

5                    MS. MORTAZAVI:  Yes, your Honor.  They have all been

6    notified.

7                    THE COURT:  Thank you.

8                    As everyone is aware, Mr. Navarro pleaded guilty on

9    August 11th of this year pursuant to an agreement with the

10   government to one count of conspiracy to commit drug

11   adulteration and misbranding in violation of Title 18 United

12   States Code §371.  Since that time, the probation office has

13   completed its investigation and the parties have filed with the

14   Court their sentencing submissions.

15                   The following documents have been received and are

16   part of the record in this matter:  The Court has received the

17   final presentence report filed on November 4th, 2021, and that

18   is on the docket at ECF 550.  That final report reflects that

19   certain revisions were made by mutual agreement, as I

20   understand it, of the parties in response to comments or

21   objections that were lodged.  Specifically, certain revisions

22   were made to the offense section, paragraphs 32 and 33.

23                   The Court has also received the defendant's sentencing

24   submission filed on December 3rd, 2021.  That's filed at ECF

25   582.  Together with that submission, there were roughly 100

LCHGnavS

1   pages of letters that were submitted in support of or on behalf

2   of Mr. Navarro.  And the Court has received the government's

3   sentencing submission filed on December 10, 2021, that's filed

4   at ECF 592, and it attaches Exhibits A through D.  And I also

5   have received a proposed order of restitution, which I'll

6   discuss with the parties in a moment.

7           Certain portions of the government's submission were

8   redacted in the version filed on ECF, but an unredacted version

9   has been filed under seal.  It's the Court's understanding --

10  well, I want to clarify.  Are the exhibits under seal?

11          MS. MORTAZAVI:  Yes, your Honor.  The government has

12  sought to file them under seal pursuant to the Court's

13  protective order.

14          THE COURT:  All of the exhibits?

15          MS. MORTAZAVI:  That's correct.

16          THE COURT:  Thank you.

17          And then, finally, the Court received on December 13th

18  a letter from Mr. Navarro's counsel that is filed on the docket

19  at ECF 594, and I also intend to discuss that further with you,

20  Mr. Kreiss.

21          So let me confirm with each of the parties.

22  Mr. Kreiss, have you read and fully discussed that presentence

23  report with Mr. Navarro?

24          MR. KREISS:  Absolutely, your Honor.

25          THE COURT:  Mr. Navarro, have you read and reviewed

LCHGnavS

1  that presentence report with your counsel?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Have you had a full and fair opportunity

4  to do so?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Were you given a full and fair opportunity

7  to make any objections that you might have to that report?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Ms. Mortazavi, has the government had an

10  opportunity to review the presentence report and to tender any

11  objections?

12          MS. MORTAZAVI:  Yes, your Honor.  And I would note

13  that the government has also reviewed a few submissions that

14  were filed by the Court yesterday at ECF No. 600, 601, 602 and

15  603.

16          THE COURT:  Thank you.  Thank you for adding them to

17  what is before the Court, although I am going to mention them

18  later.  I'll leave it at that for now.

19          Are there any objections that anyone wishes to make at

20  this time to the presentence report that have not previously

21  been lodged?

22          MS. MORTAZAVI:  Nothing from the government.

23          THE COURT:  Mr. Kreiss.

24          MR. KREISS:  No legal or factual objections, your

25  Honor.

LCHGnavS

1            THE COURT:  Thank you very much.

2            As I said, I have a few questions I'd like to discuss

3    before we proceed.

4            So Mr. Kreiss, first, the letter that you filed on

5    December 13th, can you tell me, please, what that letter means.

6            MR. KREISS:  Exactly what I said in the letter, your

7    Honor.  I inadvertently made an argument in my sentencing

8    memorandum and it was made in error.  And when I was made aware

9    of it, I immediately contacted the government and sought to

10   retract it.

11           THE COURT:  What the Court would like to understand is

12   are you stipulating to the 60-month sentencing guideline or are

13   you reserving your right to argue still for a variance based on

14   those same arguments?

15           MR. KREISS:  No.  And I want to make it very clear.

16   We are absolutely agreeing that the advisory guideline is 60

17   months, and I made that clear in my memorandum.  I included an

18   argument in error, I have retracted it.  And yes, I'm seeking a

19   variance from the 60 months, but having nothing to do with the

20   issue of the three points for acceptance.

21           THE COURT:  Thank you.

22           Is that acceptable to the government at this point?

23           MS. MORTAZAVI:  Yes, your Honor.  If the defendant

24   intends to retract that argument, he's no longer in breach of

25   the plea agreement.

LCHGnavS

1          THE COURT:  Thank you.

2          Then I would also like to confirm with you,

3    Mr. Kreiss, that you have read and reviewed with Mr. Navarro

4    all of the proposed conditions of supervised release that are

5    set forth in the sentencing report.

6          MR. KREISS:  We have reviewed the PSR in its entirety,

7    your Honor.

8          THE COURT:  Have you specifically reviewed those

9    proposed conditions?

10         MR. KREISS:  We've gone over everything, your Honor.

11         THE COURT:  So what I would like to confirm with

12    you -- give me a moment to get the exact page -- those

13    conditions fall into three categories, as I think you know,

14    mandatory conditions are laid out on pages 37 and 38 of the

15    report, the proposed standard conditions are on page 38 through

16    39 of the report, and then there are certain proposed special

17    conditions on page 39.

18         Mr. Navarro, have you reviewed those with Mr. Kreiss?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  And you understand them all?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  Mr. Kreiss, the question I have for you

23    is:  Are you comfortable and is it acceptable to you for me to

24    refer generically to those conditions as mandatory, standard

25    and special conditions without putting anything specific in

LCHGnavS

1    that regard on the record?

2              MR. KREISS:  Absolutely, your Honor.

3              THE COURT:  Thank you.

4              Finally, Ms. Mortazavi, does the government still

5    agree -- particularly in light of our conversation so far this

6    morning -- that Mr. Navarro is entitled to the two level

7    reduction in the offense level calculation based on his, quote,

8    clear acceptance of responsibility pursuant to Section 3E1.1A

9    and a further one level reduction under Section 3E1.1B by

10   reason of Mr. Navarro's timely notice of his intent to enter a

11   plea?

12             MS. MORTAZAVI:  Yes, your Honor.  We agree that he's

13   entitled to those acceptance points and that calculation was

14   reflected in the parties' plea agreement.

15             THE COURT:  The Court will grant the motion for that

16   further one level reduction in the guidelines calculation.

17             So I would note for the record that the stipulated

18   guidelines calculation is consistent with what is set forth in

19   the presentence report.  It is also, as I'll discuss in some

20   detail in a moment, consistent with the Court's own

21   calculation.

22             So at this time, I would like to give the parties the

23   opportunity to address the Court.  Before I do, I'm going to

24   depart a little bit from what I usually do and give you my

25   current sense of where I intend to come out today so that the

LCHGnavS

1    parties can address that when you speak to the Court, if you

2    wish to do so.

3         So at this time, the Court is strongly inclined to

4    sentence Mr. Navarro to the statutory maximum sentence of 60

5    months' imprisonment.  As Mr. Navarro has acknowledged in his

6    sentencing submission and as his counsel just acknowledged a

7    few minutes ago -- well, he didn't acknowledge this part -- but

8    the statutory maximum is lower than Mr. Navarro's calculated

9    sentencing guideline range.  And as such, under the guidelines

10   is the guideline sentence.  Taking into account the serious

11   nature and circumstances of the offense, the history and

12   characteristics of Mr. Navarro and all of the other sentencing

13   factors under §3553(a) as a whole, it is the Court's view that

14   the statutory maximum of 60 months of imprisonment is the only

15   sentence available that might provide a just outcome in this

16   case.

17        Ms. Mortazavi, do you wish to address the Court?

18        MS. MORTAZAVI:  Yes, your Honor.

19        I have a few remarks regarding the defendant's

20   conduct, though I understand the Court's statements of a few

21   minutes ago, and it seems that the Court is aligned with the

22   government's view that the statutory maximum sentence, the

23   stipulated guidelines range is appropriate here.

24        There have been, obviously, many papers filed in this

25   case in relation to the litigation of this matter, as well as

LCHGnavS

this sentencing proceeding and, in particular, many letters

filed by the defendant.  But if this Court wants a window into

Jorge Navarro and how he viewed the horses under his control,

then this Court should look to the communications that the

defendant made in private with his trusted inner circle when he

thought nobody was listening.  When the defendant spoke with

people who he believed were like him, who he believed shared

his world view, the defendant spoke candidly about doping

horses.  These were people like the defendant who abdicated

their responsibilities to the horses that they were supposed to

protect, people who treated horses as commodities to be used as

a means to fame and riches and prestige, people who publicly

claimed to love animals, but privately injected and tubed and

electroshocked racehorses.  These horses were pushed up to and

beyond their natural abilities.  Also, the defendant and those

in his inner circle could maintain their own status, build

their prestige and gain access to even more horses that they

could dope and abuse.  These are the hallmarks of the

defendant's greed.

In public, the defendant perpetuated the fraudulent

pretense that he loved his horses and that his success was due

to his acumen as a horseman.  And it was simply not true.  In

private, the defendant and those in his inner circle made jokes

and made light of the defendant's prolific, callous, dangerous,

fraudulent doping.  They exchanged gifts of syringes that were

LCHGnavS

filled with dollar bills.  They exchanged emojis of a monkey, a syringe, a horse, pills, all to reflect the defendant's most potent and preferred blood builder of choice, something that they called monkey.

Marcos Zulueta, an indicted coconspirator of the defendant's joked that if Jorge Navarro kept winning races, he would be arrested.  To Navarro and his close friends, doping was a joke.  It was a crime that he was able to perpetuate for years across multiple barns, across multiple states, involving dozens of racehorses.  And because of Navarro's status as a trainer, he had unfettered opportunity to inject and drench and shock his horses with all manner of drugs for no medical purpose.  And he did not do it alone.

I want to make brief mention, your Honor, of the letters of support that the defendant has submitted to the court, because those letters of support, frankly, are shocking. It is shocking for one of the defendant's supporters to suggest that he turned horses around because of TLC.

Navarro didn't train his horses due to any skill or compassion or talent.  He relied on a bevy of drugs.  He aggressively pursued any avenue of novel drugs from any source that he trusted to test out on his horses.  He asked many others for tips on new drugs.  And when he did so, he asked, did the drugs work.  He didn't ask what was in them; he asked if they would work and if they would test, because that is what

LCHGnavS

the defendant cared about.  He did not care about the risk of
injecting an unknown, unlabeled, unapproved substance into a
horse.  He did not care about the risk of accidently
suffocating a horse by having a layperson drench the animal.
He did not care about injecting a horse with a contaminated
drug.  He did not care about overdosing a horse.  He did not
care about pushing a horse so far beyond its natural limits
that its heart literally stopped.  Navarro only wanted to know
if a drug would work and if it would test.  And that much is
apparent from defendant's conversations with others, where he
discussed a steroid that caused horses to sweat uncontrollably,
a new pain injection so potent that it caused four horses to
die, and drenching by one of his friends that, if administered
incorrectly, could be funneled into a horse's lungs and cause
that horse to drown.  Navarro cared about winning and not
getting caught.

          What else is shocking about those letters are the
number of statements that recite Navarro's trainer statistics
and professional accolades as a reflection of his character or
his integrity or his skill as a trainer.  Navarro's career as a
racehorse trainer is a sham.  It is built on an elaborate,
sprawling, fraudulent scheme.  And it is clear from those
letters that even the people surrounding the defendant new a
version of him that was built on lies.  As a trainer, he was
dishonest, unprincipled and dangerous.  As these letters show,

LCHGnavS

1    the effects of Navarro's scheme are difficult to unravel.

2         It is also shocking to see the number of letters that

3    point this court to Navarro's love of X Y Jet as an indication

4    of the defendant's good character.  X Y Jet was drugged with

5    reckless abandon by the defendant in advance of races.  That

6    horse, having undergone three knee surgeries, when it appeared

7    as if it would be unable to race a few days before a race at

8    Gulfstream Park was still pushed beyond its limits to race and

9    to win.  At the thought that this horse would not be

10   competitive at that claiming race or that it should not compete

11   at all because it was too sick to do so, Navarro panicked and

12   he invoked the people in his trusted inner circle to get drugs

13   to force that horse to compete.

14        Across multiple races, Navarro used drugs from many

15   others and the effects were apparent.  X Y Jet, who appeared

16   unable to compete at that race only a few days prior, won that

17   race in what was described as an easy victory.  And several

18   weeks later at the Golden Shaheen race in Dubai, X Y Jet was

19   once again drugged by Navarro and in that race was so far

20   pushed past his limits that he won despite losing a shoe

21   halfway through the race in the middle of the track.

22        It is shocking still, your Honor, that X Y Jet's

23   veterinary surgeon would submit a letter to this court

24   suggesting that Navarro didn't dope that horse because he never

25   talked to Navarro about any elicit drugs.  There's no doubt

LCHGnavS

1  that Navarro doped X Y Jet, and there's no doubt that he did so

2  behind the back of this veterinary surgeon.

3          It is tragic, but ultimately unsurprising, that X Y

4  Jet at only eight years old died of a heart attack only two

5  weeks after his last race.  He's a potent reminder of the

6  defendant's hypocrisy.  And a reason why so many of these

7  letters are infected by the defendant's own fraud and the lies

8  that he perpetuated about his success.

9          Finally, your Honor, it is shocking the number of

10 complicit, unindicted coconspirators who wrote letters of

11 support for Navarro claiming he was a good trainer.  This is

12 not someone who cared about his horses.  This was not someone

13 who was particularly skilled.  And these individuals had

14 clear-eyed knowledge of Navarro's doping scheme and nonetheless

15 wrote letters to this court intending to influence your

16 sentence here today.  This attitude is emblematic of those

17 surrounding the defendant who helped perpetuate these crimes.

18         Your Honor, Navarro is notable because of his

19 aggressive pursuit of novel drugs.  It is very difficult to

20 convey the breadth of all his conversations regarding his

21 doping scheme.  What is clear is that he pursued every avenue

22 and he pursued it aggressively.  And for that reason, your

23 Honor, as the Court has indicated it is inclined to do, we ask

24 that the Court impose the statutory maximum sentence of 60

25 months' imprisonment.

1        It is also for that reason, your Honor, that we have

2   asked the Court to impose an additional special condition of

3   the defendant's probation that would require the defendant to

4   refrain from training and effectuate that limitation by

5   compelling him to give up any of his state racing licenses and

6   not apply for any new licenses during the term of his

7   probation.

8        And if the Court has any questions about our

9   submissions or any of the defendant's remarks in his

10   submissions, I'm happy to address those.

11        THE COURT:  I don't have any questions.  Thank you.

12        Mr. Kreiss, would you like to be heard?

13        MR. KREISS:  I would, your Honor.  Thank you.

14        And certainly, your Honor, at this point, we don't

15   make light of the gravity, the seriousness of this case.  But

16   Mr. Navarro stands here before you having pled guilty.  He's

17   accepted responsibility for his actions and does not seek to

18   blame anyone for his conduct but himself.

19        At the change of plea hearing, Mr. Navarro, addressed

20   the Court, gave a detailed admission, responded to the Court's

21   questions, which were additionally very detailed.  And the

22   Court had inquired essentially what did you do and who did you

23   do it with.  And I've sat through a lot of change of plea

24   hearings, a lot of sentencing hearings over the years and seen

25   a lot of folks backpedal.  There was no backpedaling.

LCHGnavS

1    Mr. Navarro has come in, he's accepted responsibility for his

2    actions.  And I'm not here to contest the allegations made in

3    the government's remarks today.

4         The Court is saddled with a very difficult task, to

5    make a determination, to determine what sentence is reasonable

6    but not greater than necessary.  We agree, the advisory

7    guideline is 60 months, that's the starting point.  And I

8    understand the Court's initial statements, but we're asking the

9    Court to consider a variance.  We're asking the Court to

10   consider Mr. Navarro's personal history and characteristics

11   beyond his offense conduct.  And that's what the Supreme Court

12   has said in the progeny of many cases, essentially that the

13   Court has to look at other factors.  And certainly, I've read

14   the letters, I have read the recent submissions, understand the

15   government's remarks, but we are asking you to see

16   Mr. Navarro's personal history and characteristics from some of

17   those who know him.

18        And I think one of the letters exemplifies this from

19   Mr. John Koenig.  He says, whatever flaws he has, I feel Jorge

20   is at center good, compassionate and a caring human being.

21        Again, I recognize the serious nature of the offense.

22   This is one of those cases where certainly a lot of folks in

23   the public have reached out to the Court.  This is a situation

24   where Mr. Navarro -- he started from the bottom and was a

25   skilled horseman.  And he went wrong.  And he admits his

LCHGnavS

conduct, makes absolutely no excuses.  He's explained what

became his reality.  And he's here accepting responsibility for

his actions.

Unfortunately, the pressure, the being away from his

family -- and he's made the worst choices of his life.  Those

choices are going to haunt him for the rest of his natural

life.

There is no concern about recidivism here.  He will

never be a licensed trainer in the United States ever again.

He most likely won't remain in the United States.

But we're asking the Court, again, to consider his

personal history and characteristics.  I think it's important.

A lot of cases, I've been in many sentencings where I look into

the back of the courtroom and there's nobody there.

Mr. Navarro has his family here.  They're spread out through

the courtroom.  His wife Jennifer, his daughter Taylor, his

daughter Ashley, his son Christian, his sister, his sister

Ruth, his sister Diana, his niece Crystal, and his mom intended

to be here, but unfortunately, she was hospitalized last week

and wasn't well enough to make it up here.  There are lots of

situations where, in circumstances like this, there are no

family members, there's absolutely no support.  Mr. Navarro is

lucky to have the folks that he has.

Again, Mr. Navarro is not here today, did not come in

back in August to contest anything.  He came in to accept

LCHGnavS

1    responsibility for his actions.  As noted by probation and the

2    government, he was one of the first people to come in and enter

3    a plea publicly, which I would venture to say has had some

4    affect on subsequent pleas in this case.

5         By entering his plea, he's aided the government and

6    preserved resources of both the government and the court.  He

7    has satisfied the forfeiture of $70,000, which is significant

8    in this case.  It was done timely.  And Mr. Navarro has also

9    been out on bond for, it's going to be 21 months now, and he's

10   done everything he could do to comport and comply with the

11   orders of this court.  He's done nothing to show that he's

12   failed to accept responsibility for his actions and certainly

13   has not committed any new law or technical violations.

14        It's hard for the Court to recognize -- and I

15   understand this -- there's a huge outpouring and there's an

16   overwhelming amount of evidence in this case, but Mr. Navarro

17   has admitted his conduct and he's not shirking his

18   responsibilities.  He's here, he's pled guilty.  We're asking

19   the Court to consider his personal history and characteristics.

20        And just briefly, I want to just mention a letter from

21   his daughter.  And I quote her as saying, "My father was always

22   known to take the smaller people in, always giving someone a

23   chance.  My father was the type to help anyone out no matter

24   what time it was.  He always saw something in everyone.  He

25   always made sure everything and everyone was taken care of

LCHGnavS

1    before he took care of himself."

2              And that statement is in contradiction to the way he

3    acted in this case, and we recognize that.  But we're asking

4    the Court to see those qualities.

5              The Court must certainly impose a sentence that

6    reflects the seriousness of the offense and respect for the

7    law.  A sentence of less than 60 months would be reasonable,

8    but not greater than necessary.

9              This is a situation, Judge, where there's been so much

10   publicity.  Mr. Navarro was arrested in his home in front of

11   his family, his neighbors.  He's pled guilty to a federal

12   felony offense.  He is now labeled a convicted felon for the

13   remainder of his life.  He's lost his livelihood.  And he's

14   most likely going to be deported at the end of the day.  A

15   sentence of less than 60 months is not necessary to satisfy

16   this prong.  Quite frankly, any sentence at this point, after

17   the government's actions.  The prosecution in this case has

18   sent a message and it's loud and clear.  If you use adulterated

19   substances, you're going to be prosecuted federally.  This is a

20   case that's been followed very, very closely by the industry

21   media outlets, sometimes on a weekly and daily basis.  And it's

22   clear, if you utilize adulterated or misbranded substances,

23   you're going to be prosecuted federally.  The message is clear

24   that this is not the end of this case.

25              And when the Court is considering a sentence that,

LCHGnavS

1    again, is sufficient, but not greater than necessary, to comply

2    with that purpose, 60 months is not necessary.  Mr. Navarro has

3    been absent from horse racing now since the day he was

4    arrested.  He's not gone back to it.  He's quite frankly not

5    thought about going back to it.  He lives in that environment,

6    very close, and he's done, he's done.  He stands here

7    remorseful, contrite and only wishes he could roll back the

8    hands of time, which we know is impossible.  The only thing he

9    can do is come in, accept his responsibility.

10        We're asking the Court to consider a sentence of 48

11   months, which we believe is sufficient, but not greater than

12   necessary.  The other co-defendants that have publicly pled, I

13   believe, are facing statutory maximums of 36 months.  And if

14   the Court were to sentence Mr. Navarro today to 48 months, this

15   would be essentially a third or a 33 percent increase from

16   those other folks who have pled to statutory maximums of 36

17   months, assuming they didn't receive any variances.  It's a

18   significant percentage increase in his sentence above the

19   others who the government has made clear that Mr. Navarro is

20   more culpable.  And a third or 33 percent increase in his

21   sentence would be reasonable under these circumstances.

22        Mr. Navarro, because of his immigration status is

23   likely to -- and I don't see any way that he would get the

24   benefits that US citizens would get -- and this case is

25   different than others, we're not asking the Court to give

Mr. Navarro a benefit because he did something unlawfully.  If

Mr. Navarro had entered the United States unlawfully recently

and committed a crime and we were arguing his deportation is a

further penalty, that would be very different than the

situation here.  He came here when he was 13 years old.

Unfortunately, he was never naturalized.

But when he goes to prison, he will not go to a BOP

prison camp.  He will most likely go to a low facility.  And

those facilities, until very recently, we didn't have any in

Florida.  There has been a change in the administration to not

utilize the private facilities.  The closest recently was in

Georgia.  The hope is that Mr. Navarro would be designated to a

facility in Florida to help facilitate family visitation.  But

he won't get the benefits of the RDAP program.  If he were to

qualify for the RDAP program like others in this case and in

other cases --

THE COURT:  Does Mr. Navarro have a drug problem?

MR. KREISS:  He doesn't, your Honor.  But if there

was, he wouldn't qualify for early release after participating

in the program.  He doesn't get an early release to a halfway

house.  He's not eligible because he's not a United States

citizen.  Again, he's going to serve his sentence in a very

different environment.  He's not going to go to a prison camp.

And at the end of the day, he's going to be deported.

Again, there's no blame being passed here.  He takes

LCHGnavS

1    responsibility for his actions.  But on top of this prison

2    sentence, he's going to be most likely deported from this

3    country.  He's going to be separated from his family.  Again, a

4    situation that he's put himself in, and he takes

5    responsibility, but a variable in his sentence that's different

6    than others.

7            Based upon those factors, we ask the Court to consider

8    a sentence of 48 months.

9            THE COURT:  Thank you.

10           Mr. Navarro, do you wish to address the Court?

11           THE DEFENDANT:  Yes.

12           THE COURT:  You can remain seated if it's easier for

13   you, but please pull the microphone down so that the court

14   reporter can hear you.

15           THE DEFENDANT:  Your Honor, I would like to start off

16   by apologizing to the Court, the government and most of all to

17   my family and my racetrack family.  I was introduced to the

18   racetrack world at age 13 by my stepfather after coming to this

19   incredible country to live a new life.  I knew, as I got older,

20   I wanted to become a trainer one day.  I started from the

21   bottom as a hot walker, groom, as an assistant trainer for many

22   years.  During my upbringing at the track, I also worked as a

23   vet tech.  I wanted to learn more about young horses, so I

24   moved to Ocala to learn about training horses from an early

25   stage.  The reason I wanted to learn every aspect of horses was

1    because I wanted to have the knowledge of what it took to be

2    known as the best trainer in this country.

3              Over the years, as time went by, I became that trainer

4    that I prepared myself to be.  What I didn't prepare myself for

5    was how to handle the pressure from the winnings, the losing,

6    the media, the owners and the negative backlash that comes from

7    the racing world or the racetrack world.

8              I pushed my family aside and I was giving all my time

9    to the sports that I love.  I became hungry to be a winner.

10   Somewhere along the way, the pressure started to get to me.  I

11   felt I had to win to become respected in the horse racing

12   industry without thinking of the consequences I face today.

13             I started as a trainer working with horses that people

14   gave up on, hoping one day I would be able to train top quality

15   thoroughbreds.  Your Honor, I became a selfish person who only

16   cared about winning.  I lost my way and betrayed my horses that

17   I adore and love so much.  They were what I truly loved most

18   about being a trainer.  They were by my side during my lonely

19   days, my hard days and my happy days.  I only wish I could go

20   back in time and change the person I became.

21             I remember why I choose to be a trainer, which was my

22   love for the horses.  It was the horses that brought me my

23   greatest joy.

24             Your Honor, I fully take responsibility for everything

25   I have done.  And I apologize again to all the people I hurt,

1   including my horses.

2           Now that I have spent two years away from the horses

3   and the racetrack, I have realized that there was no need to

4   change who I was as a horseman.  I should have quit when I

5   couldn't handle the pressure, rather than putting my horses, my

6   family, my workers and the people who believe in me through all

7   this.  It certainly wasn't worth it now that I'm going to

8   prison, facing deportation to a foreign country where I have no

9   one.  During this time away from the track, I have become a

10  better man.  I have had the time to make up for what my

11  devotion to the racetrack life took away from me -- took away

12  from my kids and my family.  My kids are seeing their father

13  they knew they had.  I'm enjoying things I took for granted

14  while I was a trainer.  But there's still one thing I miss, the

15  horses.

16          Your Honor, this has been the hardest thing I have

17  ever gone through and my family has ever gone through.  My kids

18  need me.  I missed a lot of their time growing because of my

19  love for the horse racing.  And I know now I don't want to lose

20  anymore time with my children and grandchildren.

21          I truly hope the industry changes to keep racehorses

22  safe in the future.  I know my conduct deserves to be punished,

23  but I pray that you have mercy today.  Thank you for allowing

24  me to address the Court.

25          THE COURT:  Thank you, Mr. Navarro.

1          THE DEFENDANT:  You're welcome, your Honor.

2          THE COURT:  At this time, I will describe the sentence

3    that I do intend to impose.  The attorneys will have a final

4    opportunity to make any legal objection before sentence is

5    finally imposed.

6          Under the sentencing reform act of 1984 and governing

7    Supreme Court precedence, I must consider the sentencing

8    guidelines when determining a sentence.  I must also, after

9    calculating the applicable sentencing guideline range and

10   properly considering that, I must consider any departures from

11   that range and then I must consider the other sentencing

12   factors under §3553(a).

13         In this case, the parties entered into a plea

14   agreement with a stipulated guideline sentence of 60 months.

15   Probation reached the same sentencing guideline calculation.  I

16   too have also reached the same calculation relying on the

17   uncontested facts in the PSR and the record before me.

18         I should note that the parties also agreed, in

19   connection with Mr. Navarro's plea, that he would forfeit a

20   total of $70,000, which counsel has told me has been done.

21   Mr. Navarro also agreed to pay restitution in the amount of

22   $25,860,514.

23         Briefly, let me just outline for the record my

24   guidelines calculation.  The guidelines provision in effect as

25   of November 1, 2018 apply and govern in this case.  With

LCHGnavS

respect to Count One, which charges Mr. Navarro with conspiracy
to commit misbranding and drug adulteration with the intent to
defraud or mislead to which Mr. Navarro pled guilty, the base
level offense is six and that is regardless of whether we look
under sentencing guidelines Section 2X1.1A, 2N2.1 or 2B1.1A2.
26 points or levels are added to that by reason of specific
offense characteristics.  Specifically, the base offense level
is increased by 22 levels because the loss exceeded
$25 million.  The offense level is increased by another two
levels because the offense involved ten or more victims.  And
the offense level is increased by another two levels because a
substantial part of the fraud was committed outside of the
United States and otherwise involved sophisticated means.
There's a further six point adjustment regarding Mr. Navarro's
role in the offense.  Two points are added because Mr. Navarro
violated his duties under state licenses, abusing a position of
trust.  And a further four level increase applies because
Mr. Navarro was the lead trainer with assistant trainers and
vets and others acting at his direction.

          The Court did apply, as did probation in its
sentencing report, the three level reduction for acceptance of
responsibility.  That results in a total offense level of 35.
Although Mr. Navarro does have some prior criminal offenses,
including a DUI, and I understand a domestic violence incident,
his criminal history score is nonetheless zero, which results

LCHGnavS

1    in a criminal history category of I.

2              Based on these offense levels and criminal history

3    calculations, Mr. Navarro's guideline sentencing range would be

4    168 to 210 months in prison.

5              However, the statutory maximum term of imprisonment

6    for the offense to which he has pled guilty is five years.  As

7    a result, the guidelines dictate that that sentence of 60

8    months is the guideline sentence.  The guidelines also provide

9    a fine range of $40,000 to $250,000.  And they provide for one

10   to three years of supervised release for a class D felony.

11             Now, as I say, I have carefully considered the

12   sentencing guidelines calculation and the various factors with

13   respect to sentencing that are laid out in Title 18 United

14   States Code §3553(a).  At this point, I'd like to discuss or

15   explain my consideration of those factors.

16             First, the crimes that Mr. Navarro committed are

17   serious, they were dangerous, they were cold, and they were

18   calculating.  For years, you cheated, Mr. Navarro.  And you

19   effectively stole millions of dollars.  You cheated other

20   owners, trainers and jockeys against whom your horses competed.

21             At the time of your plea, you specifically admitted

22   certain facts, both in writing in your plea agreement and then

23   orally on the record in open court when I specifically asked

24   you during your plea if the statements in the agreement were

25   true and accurate.  Among the facts you admitted are the

LCHGnavS

following:  From in and at least 2016 through on or about

March 9, 2020, you administered and directed others, including

veterinarians working at your direction, to administer nonFDA

approved misbranded and adulterated drugs, including drugs

intended to increase the performance of thoroughbred racehorses

under your custody and care.  Those drugs included blood

building substances, vasodilators, imported and misbranded

bronchodilators, bleeder pills, SGF 1000 and others.  Each of

those drugs were misbranded and/or adulterated, insofar as they

were new animal drugs that had no FDA approval, they were

administered to your horses with no valid prescription and/or

they were manufactured in facilities without FDA registration.

Among the horses to which you administered such drugs were the

horses X Y Jet, War Story, Shancelot, and Nanoosh.

        Among other incidents that are in the record before

me, Mr. Navarro has admitted that he administered these drugs

to X Y Jet, including blood building substances from in or

about February 2019 through March of 2019 in order to enhance

X Y Jet's performance at the allowance optional claiming race

at Gulfstream Park in February of 2019 and at the Dubai Golden

Shaheen race in the United Arab Emirates on March 30th of 2019.

        In or about May of 2019, Mr. Navarro and one of the

owners of Nanoosh agreed to continue administering such drugs

to that horse in order to improve Nanoosh's racing performance.

        Mr. Navarro admitted he participated in the interstate

LCHGnavS

shipment and distribution of nonFDA approved, misbranded and
adulterated drugs.  During the course of that scheme, he
provided misbranded bronchodilator drugs to, among other
people, the trainer, your co-defendant, Jason Servis.  Among
your means of evading detection of your unlawful scheme were
the use of drugs that you believed would be untestable by
racing officials.  The coordination of the administration of
those drugs with other trainers and vets in order to avoid
physical detection by racetrack employees and racing
authorities and the preparation in coordination with certain
complicit veterinarians of false veterinary bills designed to
deceive racing officials and/or racetrack employees who might
demand proof of a valid course of veterinary care.

        You further stipulated that, among other aggravating
factors, the applicable intended loss amount at issue in this
case was greater than $25 million.  Through this specific
conduct, which you admitted, and through your multi-yearlong
pattern of conduct reflected in the record before me, you have
demonstrated, Mr. Navarro, a callous disregard for the
well-being of the horses entrusted to your care.  Bottom line,
you likely killed and you certainly endangered horses in your
care and potentially other horses competing in races you
entered.  You put at risk of serious physical injury or death
the jockeys who rode the horses you drugged and perhaps horses
competing against your horses.

LCHGnavS

1          Moreover, you bragged openly about what you were

2     doing.  You sent, as the government has outlined, text messages

3     with emoji type images of monkeys, rockets, syringes, horses

4     and pills clearly representing the drugs you were

5     administering.  And you received texts from an associate with

6     an image of a syringe with the plunger pulled back filling it

7     with dollar bills.  You were so open and notorious and brazen

8     about your crimes that you were dubbed the juice man.  And you

9     even kept in your barn a pair of crock style shoes that had the

10    words "juice man" across the toes.

11         The record is very clear that, at the same time, you

12    took steps to hide what you were doing from drug regulators and

13    racing officials, and you went to great lengths to avoid

14    detection.  The scores of text messages and intercepted

15    conversations reveal that the misbranded, unauthorized and

16    adulterated performance-enhancing drugs were secretly

17    administered, designed to be undetectable in drug tests and

18    that you engaged in an escalating campaign to evade being

19    caught.

20         You did not suffer from a momentary lapse in judgment

21    or engage in a one-time abhorrent act.  Rather, the evidence in

22    this case and the facts which you admitted in connection with

23    your plea make clear that you engaged in a multi-yearlong

24    course of bad behavior that has impugned the integrity of the

25    sport of horse racing that you profess to love.

1          I have carefully reviewed your sentencing submission

2    several times and I've listened to your comments and the

3    arguments of your counsel.  While I do accept that you are

4    remorseful and that you are sorry and that you wish you could

5    turn back the clock, you said to me that you didn't think about

6    the consequences that you were facing.  You also didn't think

7    about the consequences to the sport of horse racing or to the

8    animals entrusted to your care.

9          There's nothing that I find in your sentencing

10   submission that militates in favor of a variance in this case

11   or anything that I believe justifies a below guidelines range

12   sentence.

13         The letters submitted to me, along with your

14   submission, make it clear that apparently you do have a

15   close-knit, large, loving and supportive family.  You

16   immigrated to the United States from Panama when you were a

17   teen, and you realized your family's hope and dream for a

18   better life.  Although your father was absent from your life,

19   you were raised by a loving mother and stepfather, who

20   apparently treated you as a naturally born son and taught you

21   about horses and the horse racing industry and introduced you,

22   as I understand it, to your chosen career as a horse trainer.

23   You have no history of abuse, addiction, serious illness, no

24   mental health or emotional problems.

25         The hundred pages of letters and emails of support

that were submitted by you in connection with your sentencing

submission paint a picture of a family man, a man of faith, a

hard worker, a person who was willing to help those in need and

who gave professional opportunities to people trying to find a

way in this country or in your sport.  Several characterize you

as a father figure, big brother, a friend.  All of these are

admirable traits.

        But I do have to say that, in all honesty, those

letters taken collectively are not helpful to your cause.  I

note initially that many of the letters of support were

submitted by individuals who appear to have been involved to

various degrees in the wrongful conduct underlying your

conviction.  As importantly, many of the letters simply ignore

reality and your own admissions of wrongdoing at the time of

your plea.  The people who wrote to the Court to provide

character references or to suggest leniency tell the Court, one

after the next, that you, quote, loved horses and the sport of

horse racing, that you gave your horses, quote, "the best

possible care."  That you, quote, "made very good decisions for

the safety and welfare of the animals."  And quote, "that you

always did what was best for your horses," close quote, to

quote just a few.

        The reality is that someone who loves horses does not

engage in the conduct that you engaged in or subject the

animals you supposedly loved to cruel and dangerous drugs and

LCHGnavS

treatment.  The letters characterize the time since your

indictment as, quote, "unfair."  They say that everything you

lived for was, quote, "taken away," that your, quote,

"livelihood was taken away."  And that what, quote, "has been

done to you is unfair and based on lies."

In reality, Mr. Navarro, no one did this to you.  You

did this to yourself.  And you did it to the animals entrusted

to your care and to the sport of horse racing.

I should also note, as Ms. Mortazavi did, that the

Court also received a handful of emails and letters that were

gratuitously sent to my chambers by individuals who urge a much

harsher sentence.  I've disclosed those communications to the

government and to Mr. Navarro's counsel, and I have filed them

or caused them to be filed on the docket in this case.  I will

tell you that those letters have not weighed in my fashioning

of a sentence in this matter.

Now, I'm still somewhat confused, frankly, by

counsel's arguments about acceptance of responsibility.  I

understand you're not seeking a departure and apparently you're

telling me not a variance on the grounds that Mr. Navarro

accepted responsibility or gave timely notice of an intent to

plea.  To have requested a departure on that grounds in the

first place is wholly inappropriate, as you now seem to

recognize.  But neither does that argument, in the Court's view

provide the basis for a variance.  The theory underlying that

LCHGnavS

argument is simply incorrect.  The three point reduction was
applied to Mr. Navarro's guideline sentence and calculation.

And importantly -- and this is the reason I'm
addressing this so everyone understands this point -- to
Mr. Navarro's extreme benefit, not to his prejudice and not to
his detriment, as you seem to be assuming, he is enjoying the
benefits of a statutory maximum of five years on the time to
which he is to be sentenced.  You ignore the fact that the
reason I am constrained by a five year statutory maximum is
because the government allowed Mr. Navarro to plead guilty to
only one of the two conspiracy counts charged in the
indictment, charged against him in the indictment.  If he had
been convicted at trial on those two counts, he faced ten years
in prison for the two charged counts.

Moreover, in connection with Mr. Navarro's plea, the
government agreed not to pursue other possible charges against
him for his conduct.  And those other possible charges could
well have exposed him to further prison time.  So for example,
if he had been charged with wire and mail fraud, the penalties
for those offenses are far greater than the five year statutory
maximum.  So he is, in reality, reaping a significant benefit
from his timely plea and his acceptance of responsibility.

I would just remind everyone that Mr. Navarro swore to
me at his change of plea hearing that he pleaded guilty because
he was in fact guilty, not because he was promised anything.  I

LCHGnavS

repeatedly warned Mr. Navarro that I could impose any sentence
up to the statutory maximum and that nobody, including the
government, could promise him less and that he could not take
back his plea if he were disappointed with the sentence that
would be imposed.

Now, while at the same time saying he accepts
responsibility and he expresses remorse, which I believe is
sincere and genuine, you ask on his behalf and, Mr. Navarro,
you point to pressure, outside pressures from owners and from
the industry I guess in an attempt to explain your conduct.  If
you were pressured, it was because you chose to work with and
for people who were complicit in a cruel and fraudulent sector
of the racing business.  And there's evidence before the Court
that you were pretty pleased with your choices and proud of the
results you achieved until you got caught.

You have also made a second argument asking for
leniency based on immigration consequences of your conviction.
You argue that you're almost certain to be deported which means
separation from your family and incarceration beyond the term
of imprisonment at an ICE facility.

According to the PSR, you are in this country legally
as a permanent resident with a Green Card.  I do not think any
of the potential immigration consequences weighs heavily in
favor of leniency here.

You told probation, Mr. Navarro, that you came to this

LCHGnavS

country in 1987 to live the immigration dream.  In this

country, the American dream is that through hard work one might

have amazing opportunities.  You achieved that dream.  I do

believe, contrary to what the government says, that you

actually are a talented and skilled horse trainer.  But

somewhere along the way, you got greedy and you chose to cheat.

I warned you at the time of your plea that there could

be immigration consequences to pleading guilty.  And I

specifically asked you and you assured me that you had

discussed those consequences with your attorney and you waived

any challenge to your conviction and sentence based on

immigration consequences regardless of the advice you received

about the immigration consequences of your plea.

I have carefully balanced your early plea and your

expressions of remorse and your professed acceptance of

responsibility coupled with your personal characteristics

against the seriousness of your conduct and your relative

culpability in the charged conspiracies.  You enjoyed and you

abused a position of trust.  And you were a leader of the

alleged conspiracies, central to the conspiracies pled in the

indictment.  You were the lead trainer in your barn, and you

directed the actions and conduct of many people, those who

worked for you and at your direction and others.

The number of victims of your fraud and the magnitude

of the intended loss attributable to your conduct is enormous.

LCHGnavS

1        Finally, while I have considered the 3553(a) factors,
2    it's appropriate for me to note specifically that in
3    determining the appropriate sentence, the statute directs me to
4    impose a sentence sufficient, but not greater than necessary,
5    to comply with the purposes of sentencing, which include to
6    reflect the seriousness of the offense, to promote respect for
7    the law, to provide just punishment for the offense, to afford
8    adequate deterrence to criminal conduct, and to protect the
9    public from further crimes of the defendant.

10        As we have discussed, I am constrained in this case by
11    the statutory maximum of 60 months' imprisonment.  I would
12    impose a longer sentence if the law allowed.  But as reflected
13    in the statute, Congress has determined that 60 months is
14    sufficient.

15        Having carefully considered the facts of this case and
16    the purposes of sentencing, I find that sentence is not greater
17    than necessary to serve the legitimate purposes of sentencing
18    set forth in Title 18 United States Code §3553(a).  A sentence
19    of 60 months is necessary to send a strong message to
20    participants in the horse racing industry that abuse of the
21    animals entrusted to their care, defrauding racing and drug
22    regulators, stealing from and jeopardizing the safety of other
23    racing participants will not be tolerated and will result in
24    serious consequences.

25        Contrary to what Mr. Kreiss has argued, the threat of

LCHGnavS

prosecution alone is not enough.  A guideline sentence is
necessary to afford deterrence to criminal conduct both by the
defendant before me today and by others in the racing industry.
That sentence is also necessary to promote respect for the rule
of law and to provide just punishment, Mr. Navarro, for your
conduct.

So as I have said, it is the Court's intent to
sentence Mr. Navarro to 60 months of imprisonment followed by
three years of supervised release with the mandatory and
special conditions that are set forth in the PSR that we talked
about earlier.  In addition, the following special conditions
will apply to the term of supervised release:  Mr. Navarro must
provide the probation officer with access to any requested
financial information.  You must not incur new credit charges
or open any additional lines of credit without approval of the
probation officer unless you're in compliance with the
installment payment schedules that we need to talk about with
regard to the forfeiture order in this case.  You must obey the
immigration laws and comply with the directives of immigration
authorities.  If the probation officer determines, based on
your criminal record, personal history or characteristics that
you pose a risk to another person, including any organization,
the probation officer, with the prior approval of the Court,
may require you to notify the person about the risk, and you
must comply with that instruction.  The probation officer may

LCHGnavS

1    contact that person and confirm that you have provided notice

2    about the risk.

3            I am not going to impose the additional special

4    condition requested by the government that you be banned from

5    horse racing and that you not apply for further license.  I am,

6    however, continuing or imposing as a condition of your

7    supervised release the condition that I added to the bail

8    conditions for all defendants in this case.  So Mr. Navarro,

9    while on supervised release, you must comply with the rules and

10   regulations of any licensing regime to which you are or may be

11   subject, including appearances at any proceedings, disciplinary

12   or otherwise, if required, consistent with any constitutional

13   rights, and you will abide by the licensing regulations in

14   effect at the time and the decisions of the individual

15   licensing authorities to whom any application is made.

16           There is, in addition, a $100 mandatory special

17   assessment payable immediately.

18           In this case, restitution is mandatory.  And

19   Mr. Navarro and the government have stipulated to the amount of

20   restitution.  I have been given a copy of a proposed order of

21   restitution, which includes the stipulated amount of

22   $25,860,514, which is payable to the victims of the offense

23   charged in Count One of the indictment.

24           Mr. Navarro's liability for that restitution is joint

25   and several with that of any other defendant ordered to make

LCHGnavS

1    restitution for the offenses charged in Count One.

2            The Court will enter the order that has been handed up

3    to me.  Mr. Kreiss, I assume you have seen this?

4            MR. KREISS:  Absolutely, your Honor.  I have reviewed

5    it with Mr. Navarro.

6            THE COURT:  And this is on consent?

7            MR. KREISS:  Yes, your Honor.

8            THE COURT:  The Court will enter that order.  But as I

9    say, I do wish to speak with the parties further about the

10   schedule attached to that order, which is the schedule of

11   victims.  The government has filed that schedule of victims

12   under seal, as is often customary.

13           Ms. Mortazavi, I do have a question for you.  Is it

14   your position that the categories of those victims is

15   confidential and needs to be under seal or just the individual

16   identities of the victims and the amounts to which each is

17   entitled?

18           MS. MORTAZAVI:  The categories are not under seal,

19   your Honor.  It is the particulars of each victim and what they

20   are owed.  And the Court is correct that typically this is

21   filed under seal, including when it involves entities such as

22   banking institutions.

23           THE COURT:  Are you prepared to talk to me on the open

24   record about the categories of victims?

25           MS. MORTAZAVI:  Certainly, your Honor.

LCHGnavS

1          THE COURT:  Why don't I reserve that to the very end,

2     and let me finish with the sentence I intend to impose and

3     actually imposing the sentence, and then we'll discuss the

4     specifics of restitution.

5          MS. MORTAZAVI:  Very good.

6          THE COURT:  In addition to restitution, Mr. Navarro

7     has stipulated to forfeiture in the amount of $70,000.  I

8     understand that that amount has already been paid; is that

9     correct?

10          MR. KREISS:  Yes, there was a wire sent to the United

11    States marshal service.

12          THE COURT:  And the Court previously entered the

13    preliminary order of forfeiture.

14          Ms. Mortazavi, have you confirmed that that amount was

15    received?

16          MS. MORTAZAVI:  That's correct, your Honor.  And that

17    amount was received prior to today.

18          THE COURT:  Finally, with respect to a fine, the

19    guidelines do say that the Court shall impose a fine unless the

20    defendant is unable to pay.  In this case, based on the

21    information found by probation and the information set forth in

22    the PSR, I do find that after forfeiture and restitution are

23    paid, Mr. Navarro is unlikely to be able to pay any fine, and I

24    therefore am not going to impose a fine.

25          Does the government know of any legal reason that the

LCHGnavS

1    sentence may not be imposed?

2            MS. MORTAZAVI:  No, your Honor.

3            THE COURT:  Mr. Kreiss, does the defense know of any

4    legal reason that this sentence may not be imposed?

5            MR. KREISS:  No legal reason, your Honor.

6            THE COURT:  No objections?

7            MR. KREISS:  No objections.

8            THE COURT:  Mr. Navarro, would you please stand.

9            It is the judgment of the Court, Mr. Navarro, that you

10   be sentenced to a term of incarceration of 60 months.

11           I will say, we haven't talked about this and there

12   wasn't any comment about this, but Mr. Navarro, in light of the

13   fact that next week is the Christmas holiday, I do understand

14   that you have young children, you have been compliant with the

15   terms of your release pending sentence, I do find that

16   Mr. Navarro is a candidate for voluntary surrender, and so I am

17   not going to be directing that you be taken into custody today.

18           You're directed to voluntarily surrender on

19   January 18th at a facility to be designated by the Bureau of

20   Prisons.  I did consult with probation before today about this

21   timing.  And counsel will obviously be in touch with the people

22   who make these decisions about designating the facility.  And

23   you'll be in touch with the Court if there's a need.

24           I also sentence you to a term of supervised release of

25   three years, subject to the mandatory and standard conditions

1    in the PSR and the special conditions that I have just put on

2    the record.

3         You must pay a special mandatory assessment of $100

4    for the count to which you pled guilty.  I do find that you are

5    unable to pay a fine after you fulfill your obligations for

6    forfeiture and restitution, and therefore, I am not imposing a

7    fine in this case.

8         I will, as I said, sign the order of restitution

9    directing that you shall pay restitution in the total amount of

10   $25,860,514 to the victims of the offense charged in Count One

11   of the indictment.  That obligation is joint and several with

12   any other defendant ordered to make restitution for the offense

13   charged in Count One of the indictment.

14        You may be seated, sir.

15        Mr. Kreiss, I understand that you have requested and

16   the Court will ask that Mr. Navarro be designated for a

17   facility as close as possible to Florida.  I believe you said

18   South Florida.

19        MR. KREISS:  I think if the recommendation just states

20   a facility as close to South Florida as possible.

21        THE COURT:  Does not Mr. Navarro live in Ocala?

22        MR. KREISS:  He's in Ocala and actually the facilities

23   would be in the middle district.  So a facility as close to his

24   family to aid in visitation I think would be appropriate.

25        THE COURT:  The Court will request that that

LCHGnavS

1    designation be made.

2            Is the government moving at this time to dismiss any

3    open counts against Mr. Navarro?

4            MS. MORTAZAVI:  Yes, your Honor.  We move to dismiss

5    the open counts in the S6 indictment and in the original

6    indictment.

7            THE COURT:  Any open counts in the S6 indictment and

8    in the original indictment against Mr. Navarro will be

9    dismissed at this time.

10           Mr. Navarro, I would like to advise you that to the

11   extent you have not waived that right in the plea agreement,

12   you have the right to appeal from your conviction and from your

13   sentence.  If you are unable to pay the costs of an appeal, you

14   may apply for leave to appeal *in forma pauperis*.  The notice of

15   appeal must be filed within 14 days of the judgment of

16   conviction, which we will finalize as promptly as possible and

17   file it in this case.

18           Let me turn to the question that the Court has with --

19   Mr. Kreiss, did you have something?

20           MR. KREISS:  I would ask for one concession, if the

21   Court would consider it, I have spoken with the government, and

22   we would respectfully ask the Court to consider a 60-day

23   surrender, if the Court would permit.  This is a significant

24   sentence, and due to the permanency of the resolution of this

25   case and Mr. Navarro going into custody, just so he can be with

LCHGnavS

```
1    his family and get his affairs in order.

2              THE COURT:  Ms. Mortazavi.

3              MS. MORTAZAVI:  The government does not object and

4    agrees with the Court's assessment that he is a good candidate

5    for voluntary self-surrender.

6              THE COURT:  The Court will grant the request.  I will

7    tell you in all candor that I said that I had spoken with

8    probation.  I directed the 30 days, which probation told me

9    they needed that at the absolute minimum.  I do know from

10   experience that it is taking longer than the 30 days for a

11   facility to be designated, sometimes it takes as long as 90

12   days.  So the Court will grant the request for voluntary

13   surrender 60 days from today at whatever facility is

14   designated.  If one is not designated by that time -- that's

15   what I was alluding to earlier -- obviously, counsel will come

16   back to the Court and will make whatever arrangements have to

17   be made.

18             MR. KREISS:  Thank you, your Honor.

19             THE COURT:  Now, as I said, I'd like to talk about

20   restitution.

21             Ms. Mortazavi, the general category of victims you

22   have identified for the record, please.

23             MS. MORTAZAVI:  The general categories are various

24   racetracks that paid out funds to Navarro that never should

25   have been paid.
```

LCHGnavS

1          THE COURT:  Mr. Kreiss, you need to listen to this.

2          Say it again, Ms. Mortazavi.

3          MS. MORTAZAVI:  The general categories of victims,

4    your Honor, that are entitled to restitution are the racetracks

5    that paid purse winnings to Navarro for Navarro-trained horses

6    that won races that never should have received purse winnings

7    because they were dosed.

8          THE COURT:  That's different than what you said a

9    minute ago, but --

10         MS. MORTAZAVI:  Certainly.

11         THE COURT:  The question the Court has is the

12    following:  Have you discussed with Mr. Kreiss who the victims

13    are?

14         MS. MORTAZAVI:  We provided Mr. Kreiss with this

15    schedule of victims prior to today's proceeding.  He has seen

16    it and I assume reviewed it with the defendant.

17         THE COURT:  The question the Court has is the

18    following -- and really, Ms. Mortazavi, it keys off of how you

19    first formulated to me, before I told Mr. Kreiss to pay closer

20    attention -- you said, the racetracks who paid out purse money

21    that they shouldn't have paid.  What it seems to the Court and

22    the reason I have a question is it seems to me that each of

23    these racetracks would have paid the purse regardless of

24    Mr. Navarro's doping of the horses.  It just would have paid

25    the purse to somebody other than Mr. Navarro and the other

LCHGnavS

1    horses -- actually, they pay it to the owner, I think, and

2    Mr. Navarro gets a share; correct?

3          MS. MORTAZAVI:  That's correct, your Honor.

4          THE COURT:  The tracks would have paid out that money

5    regardless.  So the question I have is how are the tracks the

6    victims and not the owners of the horses who came in second,

7    third, fourth and actually fifth, since the fifth place horse

8    would have been fourth, and as I understand it, a fourth place

9    horse shares in the purse; correct?

10         MS. MORTAZAVI:  I understand the Court's concern.  And

11   as a practical and legal --

12         THE COURT:  It's a question more than a concern.

13         MS. MORTAZAVI:  Certainly.  The Court's question on

14   this is well taken and something that the government has

15   considered.  As a practical and legal matter, the racetracks

16   are going to end up being the clearinghouse for claims.

17         THE COURT:  I understand that.

18         MS. MORTAZAVI:  By these other competitors for the

19   purse winnings that they believe they are entitled to and are

20   now legally entitled to because of the defendant's admissions.

21   So this was the most practical resolution of attempts to get

22   these monies back to those competitors.

23         THE COURT:  I do understand.  And frankly, that's part

24   of what I have been pondering.  I imagine it's not an

25   impossible task.  You have obviously identified the races

LCHGnavS

1    involved or you couldn't have identified the racetracks and the

2    appropriate amounts, so you know the races that were implicated

3    here.  It's not a particularly difficult task to figure out who

4    came in second, third, fourth and fifth, and you could get that

5    from the charts and other online databases and certainly the

6    racetracks would have it.  But by what you are doing, you are

7    placing a burden now on these racetracks to go back and

8    recalculate everything.

9            Have you been in touch with these tracks?

10           MS. MORTAZAVI:  The tracks are aware of our case.  We

11   have obviously been in contact with them throughout this case.

12           THE COURT:  But are they aware of your intent to put

13   this burden on them?

14           MS. MORTAZAVI:  I believe, your Honor, that burden is

15   going to shift to them because the other competitors are going

16   to go to the racetracks, in any event, to attempt to receive

17   these funds.  They wouldn't be able to go to the government in

18   the first instance for these funds because we won't have them

19   in our possession.  So in a way, this is bridging the gap,

20   because competitors will be turning to the racetracks, as I

21   mentioned, in any event, following today's proceeding.  And

22   this will provide a mechanism by which the racetracks can

23   rectify the wrongs that have been caused.

24           THE COURT:  Any comment from you, Mr. Kreiss?

25           MR. KREISS:  No.

LCHGnavS

1        THE COURT:  The Court will enter the consensual order

2    of restitution, then.  It does appear that you have thought

3    through the logistics.  The only piece of it that I think isn't

4    factored in is the additional cost and expense and burden on

5    the tracks, but I suppose that is part of the cost of doing

6    business.

7        Thank you, Ms. Mortazavi.

8        MS. MORTAZAVI:  Thank you, your Honor.

9        THE COURT:  Before we depart, there are two orders of

10   business.

11       Mr. Navarro, I would just like to speak to you

12   directly.  I take to heart your comments that you have used

13   this period of time since your indictment to really do some

14   serious soul searching, to try to become a better man, to try

15   to go back to what people have painted you once were.  I just

16   implore you to use this time that you are incarcerated to

17   continue that journey, to think about what you're going to do

18   productively once you're released from prison and to continue

19   to strive to be the best person that you can be under the

20   circumstances.

21       I thank our court reporter for being with us today.

22   It's been a rather long proceeding, but thank you.

23       Is there any other business, Ms. Mortazavi?

24       MS. MORTAZAVI:  Nothing further.  Thank you.

25       THE COURT:  Ms. Kreiss.

LCHGnavS

1            MR. KREISS:  Nothing further, your Honor.

2            THE COURT:  Thank you.

3            Best wishes to you, Mr. Navarro.  It's odd to say

4    under the circumstances, but I wish everyone as happy a holiday

5    and as merry a Christmas and a good new year as you can have.

6    Thank you.  We're adjourned.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25